Good morning. May it please the court. My name is Jim Phillips and I represent the appellant Yakima Valley Memorial Hospital. With me here today is Mr. Linaway, the CEO and president of Yakima Valley, and my partner Mr. Meserle. There are two appeals before you here today. The first is our appeal of the court's granting of the department's motion for summary judgment, and also before you is regional's appeal of the court's denial of its motion to intervene. I want to confine my oral argument to our appeal on the summary judgment, and on the intervention issue we'll just stand on our briefs. All right. All right. I'd also like to reserve a few minutes in rebuttal. Thank you. As this court realizes, this case involves a claim under the Dormant Commerce Clause. The appellant memorial is claiming that the Dormant Commerce Clause is violated by the Washington Administrative Code regulations that concern the necessity of a hospital that is without cardiac surgery to perform elective PCI procedures, and that distinction is very important because what these regulations concern are whether a hospital that doesn't have on-site cardiac surgery can perform these procedures or not, and that the reason why that's relevant, I'm jumping a little bit ahead, but forgive me, the regulations in the court's, let's strike that, the guidelines, the AHA guidelines in the court's order that the court claims supports its position relate to PCI procedures basically are procedures that clean out obstructed coronaries. The district court erred in granting the department's motion for summary judgment. It drew inferences in favor of the department, the moving party, and it disregarded evidence that the appellant put into the record, the inferences from which should have led to the denial of the motion. It ignored the law with respect to analyzing the purpose or benefit of the regulations involved in this case, and that's very important in terms of figuring out how to balance the benefit against the burden. It misunderstood how the Dormant Commerce Clause applies both to in-state and out-of-state participants. As this court has already found in the first case that came up for appeal, it applies both to in-state and out-state equally. The real issue is whether the regulation burdens interstate commerce, regardless of whether you're talking about the prototypical Dormant Commerce Clause question where you have an out-of-state entity making the claim. It also ignored United States Supreme Court precedents in a case like Castle, which I'll talk about a little bit more, that requires the court to analyze. In other words, deference, when a state agency alleges public safety is the purpose behind a regulation, Castle makes it abundantly clear that you still have to analyze the regulation to make sure that's true. As a federal court, you have to be a little reluctant to be challenging medical health professionals' determination on what they think is the acceptable number. Well, when you say medical health, first of all, it was promulgated by the department, and the person who they hired to construct the regulations, even a cardiologist, had never done a PCI procedure in his life. But, Your Honor, my point here is this. Defer doesn't mean blind acquiescence. What Castle teaches is that if an agency comes into court and says, our regulation promotes and one of the benefits from the regulation is public safety, you still have to look at it. You still have to analyze it because you have to determine whether that claim is illusory or not, which we allege it is. But if there's a safe, they use the word illusory in Castle, but then they go on to say, you know, if it's not illusory, then we're not supposed to second guess it. And if they have some justification for it, even though you might disagree with it and you might have put the number somewhere else, it seems to me we would be second guessing it. No, no. I think what they did in Castle is what we would urge this court to do here, which is to take a look at the evidence and the point is it's in the regulatory agency's benefit to always allege public safety. That's what they do. That's what they did in Raymond. That's what they did in Castle. And what I think, because they know that the case law says that you defer. Well, let me start here. Maybe we should start at the bottom and work our way up. I take it from reading your brief that you agree that some minimum volume standard would be important in terms for patient safety. We think what the court relied on... That takes a yes or a no answer. Oh, sorry. Yes. Okay, so if there is some floor and that puts patient safety into the running, your argument is simply with where you put that number then, correct? No, you know, this gets ahead of myself, but I'm happy to jump there right now. This is a certificate of need regulation and the record is abundantly clear that certificate of need regulations, the benefit of a certificate of need regulation has absolutely nothing to do with patient safety. I mean, it's a total concoction pulled out of thin air and I would respectfully submit to this court, go read the prior court's opinion where it makes it abundantly clear that the purpose behind the regimes that created the certificate of need regulations was to make sure that hospitals didn't inefficiently allocate resources. It's an economic statute that wanted hospitals to make sure not build two very expensive MRI devices when a more proper allocation would be only one. And in fact, that purpose, which this court in the case noted, is exactly what RCW 70.38.015 says. That if you read the purpose behind certificate of need statutes in Washington, and it's footnote three, I think, in the prior opinion, it says that it's cost competition allocate, you know, it's derived from this argument that they don't want hospitals making inefficient allocation of resources. And what was the district court's reaction to that? I think the district court, and I'll just jump directly to that, when we pointed out to the court that RCW 70.38.015 describes what the purpose behind the statute, the benefit of it is, the court said the court ignores them because it would not be appropriate to consider either the state or federal government's overarching policy goals when evaluating the putative local benefits. In other words, the very thing that this court turned to in the prior opinion and enunciated was the purpose behind these regulations. The court specifically, in point-blank, says they're going to ignore. And here's the point. Here's the point behind that error. If you are ignoring the statute which describes what the true benefit of it is, then when you're balancing the benefit against... You're talking about 70.38.015? Yes, exactly. But it talks, it talks about, clearly health is an issue there. It talks about the health, accessible health services, and then of course controlling costs. There's no doubt controlling costs is one, but as I hear your argument, I'm hearing that it's almost as if you elevated that to be the sole reason for the statute. No, I think, well, I just relied upon what this court's already enunciated was the purpose behind the statute, wherein the court said that it was to avoid inefficient allocation of resources. This court said the purpose of CON regimes is to, quote, avoid private parties making socially inefficient investments in the market. This court, quote, corrects the market by requiring pre-approval. Footnote, RCW 70.38.015. And in fact, if you go to 015, what it says is access. You're absolutely right. Access is very important. It's to control costs. It's to strengthen price competition. But you are, again, I get back to the question of defer. If the state agency comes in and says, no, this regulation really is for patient safety, that's not deference. What CASEL teaches you to do is to actually look at the statute and look at the evidence in the record of whether there is patient safety is fostered or promoted by this regulation. And in this record, Your Honor, there isn't a scintilla of evidence that 300 versus 200 makes a difference in terms of patient safety. Could I also ask you to explain your theory of significant burden on interstate commerce? If I understood your briefs, is that limited to that Memorial or some local hospitals might make additional purchases so that the burden is fewer purchases of a certain type of product? No. Here's our argument on burden. Both CASEL, Raymond, Pike, and Hunt, all four Supreme Court cases, look at the cost to the plaintiff of the regulation. And in this case, Your Honor, we put into the record four itemizations of where the its ability to purchase supplies. So just before, let me ask, are you saying that cost to Memorial Hospital is the burden on interstate commerce? That's exactly what Pike, CASEL, Hunt, and Raymond looked at. They used the word cost. Right. But if we take your theory as I hear it, then virtually any state law regulation that creates any cost or barrier to entry would be a substantial burden. No. Okay. Where would we draw the line? No. How do we draw the line? It's balancing. It's a balance. And it's a matter of degree. That's straight out of the Pike case. And that's why it's so important what the benefit is, Your Honor. Because if the benefit, if the court looks at and makes a record of what the true benefit of this regulation is and finds, as they did in CASEL, that it's illusory, it's a balance. And I was going to bring in a teeter-totter, but I'm not going to do that. But, I mean, just think about it. If you have a benefit and it's not really patient safety, that's a very light benefit, which is balanced out by a not, you know, large burden, any kind of burden. So it really depends. So you're saying there's no, I thought before when we started, I asked you if you agreed that there was some minimum that would be important for patient safety. And you said yes. So now I'm hearing you say, but there really is no patient safety, so take it off the teeter-totter. Well, no. Patient safety would be addressed, and it is addressed in the state of Washington by statutes which say that if doctors and or hospitals are performing elective PCI procedures in a negligent way, they get their certification revoked. That's really where patient safety is directly the benefit of the statute. All right. Here, it's not. We're looking at a certificate of need regulation. And why that makes a difference, Your Honor, the 200 versus 300, is because in PIKE, when you're balancing, what it says is you're looking for a regulation which burdens interstate commerce as little as possible. It's the lesser burdensome alternative. And that's at the very end of the PIKE description of the general rule. And that's why we're insisting on 200, because there is no evidence whatsoever in this record that a minimum standard of 200 does not, that's a double negative. Let me start again. There is no evidence in this record that 200 doesn't burden interstate commerce less than 300 does. So if you're following PIKE, if you're following CASEL, and you're looking for a regulation that restricts, burdens commerce less, 200 is clearly a less burden. Right. Tell me why you feel the 2005 ACCF guidelines as well as the HMA report recommending a minimum volume of 300 is insufficient evidence or illusory evidence. Well, let's start with, I think it's the 2011 guidelines, Your Honor. That's what the court in, at ER, I can give you the citation to it. This is a very important point. Let me just make sure I've got this right. Okay. At ER 16, line 18, the court goes through an analysis of the benefit of the statute. That's the only thing that this court relies on, by the way, in response to your question about the HMA. What it relies on is the 2011 guidelines. And that's what the department said is the sole reason why patient safety is furthered by this regulation. Now, why should you not apply that? First of all, it was created in 2011. So how could it substantiate a patient safety goal for something that was created three years before that? And, in fact, in 2008, when the regulation was passed to allow for elective PCIs at hospitals without on-site cardiac surgery, this was a so-called level three procedure. And the Department of Health said it was a level three procedure. Now, the 2011 guidelines also do not say that 300 is safe. In fact, they say that 200 is safe. If you go to the same page, and that would be, may I get the record? And you're running out of time, so I'm going to give you a little rebuttal time, but if you could wrap up your answer. Okay. Well, very quickly, it says that 200 is a reasonable procedure. And also the section 7.4 of the 2011 guidelines that the court is relying upon, that applies to hospitals with cardiac surgery. It has nothing to do with what's before this court today, which is does the regulation for Certificate of Needs for Hospitals Without Cardiac Surgery burden interstate commerce? And if you go to section 4.8... Would you say that again, the guidelines apply to hospitals with cardiac surgery? With. It's not even discussed. I would say it's not even an apple and an orange because those are two fruits. These are not even two fruits. They're completely different. All right. Thank you. Good morning, Your Honor, Counsel. I'm Pam Anderson. I represent the Washington State Department of Health in this matter. With me at counsel table is Richard McCartin. He's senior counsel with the Attorney General's Office. And Alicia Fechtmeyer, who represents Yakima Regional Cardiac Center. Because the two cases were consolidated on the court's docket, we have split the time that we are prepared to argue. And Ms. Fechtmeyer will have three minutes of the time to respond to any questions the court might have about the intervention appeal. Where to start? The Pike test obviously has two components. One is whether a state regulation burdens interstate commerce, a significant burden on interstate commerce. In this case, the district court correctly held that the department's elective PCI minimum volume requirement did not violate the government commerce clause because it does not burden, does not significantly burden interstate commerce. Under this court's decision in Harris and the Supreme Court's decision in Exxon, the analysis can stop there without ever reaching the second prong of the Pike analysis. In addition, however, state statutes and rules related to public safety are entitled to the greatest degree of deference. Even if they do incidentally burden interstate commerce, and we frankly deny that this regulation burdens interstate commerce at all, but they still must be upheld unless plaintiffs can show they are wholly illusory. So I want to emphasize that there are no disputed issues of material fact here. The district court accepted Memorial's representations related to the burdens on interstate commerce at face value and resolved all disputes in Memorial's favor, as it was required to do on summary judgment. It then applied the test laid out in Pike v. Bruce Church, later Supreme Court cases, and this circuit's binding precedent, and decided that as a matter of law, those claimed effects do not violate the dormant commerce clause because they do not amount to a significant burden on interstate commerce. They're not the other view if that determination is made, then you're saying we don't have to go to whether there's a lesser intrusive regulation? Your Honor, the Pike test is a balancing test, but it requires something on the burden side of the scale. And as this Court held in Harris, certain allegations simply do not amount to a burden that's constitutionally cognizable under the dormant commerce clause. And that's the kind of allegations you have here, which are basically that one entity in the market has been deprived of market share because it can't meet a safety-related regulation. That's always true, as Your Honor pointed out with regulations. Regulations impose higher costs on some participants because they can't meet that burden, and therefore they don't have a stream of the marketplace, whether it's in-state or out-of-state. But the quality standards are upheld because they are a reasonable exercise of the state's jurisdiction. And that doesn't mean that they burden interstate commerce in the same way that regulations that impede the flow of goods into the state, impede the flow of people into the state, patients in this case, or impede the first state entity to participate in the state's commerce. Go back to my question. Yes, I'm sorry. I don't think I got an answer to it. My question was this whole issue of whether the district court should have looked at alternatives with a lesser impact. Oh, no, Your Honor, absolutely not. Under the Harris test, that's part of actually the second prong of the Pike test, which says that if it's not discriminatory, you don't look at lesser restrictive alternatives. What the court looks at is, is the state's interest wholly illusory? And if there's no evidence that it is wholly illusory, and there's not in this case, and I can explain why, then you don't look at a less restrictive alternative because it's not within the court's purview or the appropriate ambit of the federal courts to weigh competing state interests and pick from among a range of options. Those decisions are properly left to the state legislature or the state regulators. So the answer is no. So would you respond, though, to Mr. Phillips' argument that basically this is a cost-cutting, cost-management statute, and it's not really a safety statute, and that there's no real evidence of 200 versus 300 or some other number, that that's the number that was picked, but he said there's really no evidence in terms of safety. Let me unpackage that because it has a number of different elements, I think. First of all, and this is a critical point, Mr. Phillips alludes continually to the overall enabling statute for the CON, the Certificate of Need program in Washington, 70.38.015 RCW. The actual statute that deals with the elective PCI procedure is 70.38.128, and that lays out a list of legislative goals, including access to care, patient safety, quality of care, cost, and the stability of other providers who provide those types of procedures, and especially the ability of the primary cardiac care centers to maintain a sufficient patient volume. So he's really looking at the wrong statute. The statute lays out the Now, the PCI regulation has numerous parts, some of which are related to the need, some of which are related to quality of care, the arrangements that need to be made to ensure patient safety, but the minimum volume standard, the 300 minimum volume standard, serves patient safety by ensuring that hospitals performing these procedures without on-site cardiac surgery backup have a minimum volume to ensure that the entire surgery team is well prepared to deal with cases and has enough experience that they can safely perform the cases. So it is a safety regulation. Now, the final point of your question, I think, is what's the evidence that 200 procedures versus that 300 procedures is safer than 200? Well, I would submit that this court doesn't look at what the least restrictive alternative is for the reasons I previously discussed. That's a decision best left to the legislature and the state regulators. But the state, in adopting the 300 minimum volume standard, did rely on the expertise of medical professionals. The HMA study was actually a literature review of all of the peer-reviewed articles and studies on this very issue. The state also did significant stakeholdering, which involved medical professionals throughout the state, including the most renowned cardiologist in the state, and finally relied on the 2005 and later the 2011 ACCF ACA guidelines. Now, the guidelines look at studies which assess the relative safety of the PCI procedures in hospitals with cardiac backup and without cardiac surgery backup. There really aren't studies that test exactly 200 volume versus exactly 300 volume. Maybe I misheard, because I thought Mr. Phillips said it didn't relate, that at least the 2011 study didn't, related only to cardiac hospitals. The studies surveyed those hospitals, but that doesn't mean that the guidelines in terms of patient safety and minimum volumes are not equally applicable to hospitals without on-site capability. In fact, the study, the guidelines do have a number of less preferential recommendations that relate to the ability to do those procedures in a facility without cardiac backup. The guidelines never give the highest recommendation to a facility that doesn't have the surgery capability. They give a lower rating, but allow the procedure or say that it's permissible if you have a certain minimum volume and you don't have the backup procedure. But in adopting 300, the department was actually picking a number that was in the middle range of what the studies look at. The studies look at 200 to about 600. Virtually everyone says that if you do less than 200, you should consider shutting down, unless you're in a region that has such limited care that you're the only game in town for patients. And that's certainly not true in Yakima. There are two competing hospitals doing that. So as opposed to the Castle case, where you actually had empirical evidence of 50-foot truck studies and 65-foot truck studies, there really aren't any studies here that precisely measure 200 to 300. And I would submit, Your Honor, that that's precisely the reason the federal court doesn't get involved in choosing among various alternatives. The state did its best to apply the scientific evidence that was available, as it was directed by the legislature, looking at all of the peer-reviewed studies, stakeholdering extensively and relying on the best guidelines that were available to come up with a rational number that would guarantee patient safety and also, throughout the state of Yakima. So that's the answer to that. Did that answer your question? It did, thank you. Okay. It's a little long-winded, but I think I got there in the end. So anyway, I think it's important to distinguish the fact that Castle, which frankly is one of the few cases where regulation has been struck down when the state espoused a safety interest, how it can be distinguished from this case. First of all, in Castle, you have the trucking industry, which has been widely recognized throughout Supreme Court jurisprudence as requiring a certain degree of national uniformity. Second, and this may be the most compelling point, you had a legislative and executive history that demonstrated that safety was really a pretext there, that the real motivation was protectionist. If you compare that to the Yakima case, this applies even-handedly, both on its face and its impact. The PCI regulation applies even-handedly to all entities who want to provide the procedure, whether they're in-state or out-state. It hasn't had a protectionist impact, even to protect the existing providers to a great extent. The first nine applications for elective PCI procedures were granted by the Department of Health, and eight of those were actually in areas that already had existing PCI providers. You may want to start wrapping up in order to save some time for your colleague. Oh, I'm sorry. I misunderstood. I thought that this was going to just give me my time. No, it's all the time. I will wrap up. Unless there are more questions, I would just say that the district court should be affirmed because it correctly found that under Supreme Court precedent and this Court's precedent in Harris, there was no substantial burden on interstate commerce. It also correctly found that the State's safety interest was non-illusory. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Alicia Feitmeyer, and I represent Yakima Regional Medical and Cardiac Center, and I'll be speaking on the intervention appeal. Thank you for stepping in this morning. We appreciate that. Thank you very much. So, intervention should be considered in a practical and non-technical way to ensure that justice is done, and the district court misapplied the intervention standards on timeliness and adequacy of representation by preventing Regional from protecting its significant interests, its economic interests, from a challenge by its crosstown competitor. In fact, Regional's... Where was your client, Yakima Regional, when this whole thing got kicked off? Why didn't they intervene then? Regional did not intervene immediately when the complaint was filed because very soon thereafter, the State filed a motion to dismiss, and then very shortly after that, this went up on appeal to the Ninth Circuit. Furthermore, when it came back on remand, that is the time when the State contacted Regional and asked us to get involved in this matter. The State indicated that it could not adequately represent our economic interests because the State is a government entity focused on the broader public protection of its constituents, not on our specific economic interests. So when the State asked us to get involved, we began our motion to intervene, and the State supported that motion. Our intervention was timely. It was made immediately after remand. The record on the Dormant Commerce Clause was not developed, and there was plenty of time when we moved to intervene. The case schedule had not been issued, trial was not set, and it was a year away. There was no prejudice to the parties. The District Court found sui sponte that Memorial would be prejudiced by participating in additional discovery, but Memorial never argued that in its briefing, and furthermore, the District Court misunderstood the prejudice prong of the timeliness analysis. Prejudice is not whether or not it's inconvenient or burdensome for a party to or prospective party to intervene. It's about the time that the party intervenes, and there was plenty of time to address the discovery burdens that would be upon the existing parties. At the time you asked to intervene, no depositions had been taken. Is that right? There had been some discovery, but not substantial discovery. Okay. And the majority of the discovery took place during the remand stage. At that point, experts were disclosed, extensive expert discovery was done. And so really, the bulk of the development of the Dormant Commerce Clause claim was after the case was remanded. And as I mentioned, the Department of Health asked for regional's assistance in defending the Dormant Commerce Clause challenge. There's case law that suggests that when the government represents a party, it's presumed to be adequate, but you can rebut that presumption when the government interests and a private party's interests are divergent, and they are in this case. The state is charged with representing the public broadly, and we have a very specific interest in maintaining our ability to provide elective PCIs in Yakima and serve as the sole provider of elective PCIs. Thank you. Thank you very much. If there are no further questions, I'll complete. I think not. Thank you. You used up all your time. I'm gonna give you two minutes for rebuttal, so that you'll have some time to respond. I'll take it. Thank you. I'm sorry I used up all my time. No, that's fine. We had a lot of questions. Yeah. Well, the court on the state's presentation asked about a question and indicated that it had not been answered. That was your question, Your Honor, about do you look at alternatives with a lesser impact? And the Pike case states, quote, and the extent of the burden will be tolerated. That will be tolerated will, of course, depend upon the nature of the local interest involved and on whether it could be promoted as well with a lesser impact on interstate activities. It's clearly done. That's part of the balance. You're looking at, when you're balancing benefit versus burden, whether it can be done with a lesser impact on interstate activities. It's not a look at one and then look at the next. It's part of the process. The state also said that I was looking at the wrong statute at RCW 70.38.015, and I would recommend the court, I would cite the court to its prior opinion in this case, footnote three at page, the beginning of it, footnote three, where this court cites RCW 38.015. That's the public policy behind Certificate of Need in Washington. The state also mentioned that CASEL is distinguishable because highway safety somehow needs to be nationally uniform. And I would cite the court to Justice Rehnquist's dissent, wherein he describes how there is absolutely no uniformity whatsoever in those types of regulations. CASEL is on point and really our case. And then last but not least, Your Honor, I wanted to get back to your question about the 2005 guidelines. If you go to ER 15 lines 17 through 26, this is where the court is talking, district court is talking about public safety, and it is citing to the 2011 guidelines. And it goes on to talk about how it shows it as a class one recommendation versus others. And if you go to ER 580, what you will see there is that the regular, you can see where the court cites to ECF number 183 at 102. That is ER 580 and 581. That is the record that the court is relying on to find that the 2011 guidelines promote public safety. And if you go to ER 480 through 581, you'll see that it in fact, if you go to ER 551, that's section 4.8, that's the section that very clearly applies exactly to the situation before this court. And I would just add that that section, if you read it, cites to footnote 352. This is going to get into some minutia and I apologize, but footnote 352 is the dimmer report. That's in the 2011 guidelines and the dimmer report is in the record. And if you go to ER 635, at that point, the dimmer report says that 200 is a safe standard. So in other words, the 2011 guidelines, when you're talking apple to apple, cites to an expert report that says 200 is safe. If you go to 581, if you want to use the regulation which I contend doesn't apply because it applies to hospitals with cardiac surgery at ER 581, it says that it is, quote, reasonable for people, for operators to perform elective and emergent PCI at hospitals with on-site cardiac surgery if they perform between 200 and 400 per year. Now, they want you to believe that at 200, you fall off a cliff, but the very guideline that they're citing to and that the for an interventional cardiologist to perform an elective PCI at a hospital that performs 200 per year. That's what it says. Now, I close. You've now used two more minutes, so I'd ask you to close if you would. Okay, I close by just saying this. This is summary judgment. This was summary judgment. There is no record of the witnesses getting on the stand, the court. We're given an opportunity to put these people on the record. All this ambiguity, the difficulty that the court had with this would be resolved in our favor, and I ask you to reverse. Thank you. Thank you. Thank all counsel for your argument this morning. The case of Yakima Valley versus Washington State Health Department is submitted, and we're adjourned for the morning. All rise. The court for this session stands adjourned. Thank you. Thank you. Thank you. Thank you. How you doing, Jeff? All right.  Thank you. Thank you. That's it, man. That's pretty nifty how you use those. Yeah, it's nice when it works. So, both things on top, is this the canvas? Yep. You can see every, you know, A on your head. Oh, man. So, where do you get those? Ah, you gotta buy them... ...at a specialty store. Yeah. They're expensive. Those came right there for about $5,000 each. Oh. You gotta work with the system. Yep. Oh, is that right? Yeah. They're trying to do it today. Or you can say... Oh, yeah. Oh, man. Take care, man. Thank you. Thank you. How you doing? Hi there. How you doing? Good to go? You can sign on this one. Let me know if you... Let's see. Do you know what unit he's using for... ...the recruiting? No. He didn't define the name? No. iPad or something? No, no iPad. Yeah, the reason I'm asking is... ...I connected to the laptop... ...and it keeps me up. And... ...like those... ...then I ended up... ...dialing... ...to... ...the same... ...capacity... ...HD... ...HD2... ...or mobile something... ...and... ...people were quite... ...and numbers... ...did that... ...and... ...they distributed it... ...and... ...yeah. Thank you.
judges: Carney, McKeown, Ikuta